PROVOSTY, J.
The plaintiff, J. Edw. Crusel, was an oil broker and dealer, selling on commission and purchasing for future delivery to his customers. Defendant, Jas, *293 B. Tierce, was a lessee of the Jennings Oil & Syndicate Company, in the Jennings Oil Field. He and plaintiff entered into the following contract:
“State of Louisiana, Parish of Calcasieu.
“Jennings, La., March 7th, 1905.
“Memoranda of agreement made and entered into this day and date above written, by and between J. B. Tierce, of Jennings, Louisiana, party of the first part, and J. Edward Crugel, of New Orleans, Louisiana, party of the second part, witnesseth:
“Party of the first party hereby sells and agrees to deliver to the party of the second part, two hundred and fifty thousand (250,000) barrels fuel oil of forty-two (42) gallons each (same to be free from water and sediment), for the sum and price of eighteen cents (18$) per barrel, f. o. b., cars at Jennings or Mermemton, Louisiana.
“Party of the second part hereby buys and agrees to accept the amount of oil above referred to. Deliveries and payments to be made as follows:
“(1) Deliveries to begin on or about March 17th, 1905. and to continue at the rate of about fifteen hundred (1500) barrels per day until the full amount has been delivered.
“(2) Deliveries to be made to the Phcenix Pipe Line & Storage Co., or to IJeywood Bros. & Jennings Pipe Line (Option party of the second part).
“(3) Party of the first part to pay all pipe line charges.
“(4) Party of the first part has in stock about one hundred thirty five thousand (135,000) barrels of oil. Has contracts amounting to about ninety thousand (90,000) barrels. Party of the first part agrees to drill and complete two more wells and to make no additional contracts until such time as the provisions of this contract have been satisfied.
“(5) If after the fulfilling of all the conditions as above described, then and in that case, party of the first part shall not be held for damages on account of nondelivery. •
“(6) Party of the second part agrees to make settlements on the 20th of each month for all oil delivered from the first to the 15th, and on the 5th for all oil delivered from the 15th to the first of the following month.
“Witness our hands,” etc.
Defendant failing to begin delivery “on or about March 17th,” as specified in the contract, plaintiff called upon him for performance, and he informed plaintiff that he had sold the wells and therefore could not make any delivery under the contract.
It seems, however, that the wells were returned to defendant, for he did thereafter make the following deliveries to plaintiff:
1905. • ■ Bbls.
April 11 S. O. Co................. 5,000.
“ 29 “ ........■......... 1,100.
May 18 Morse Oil Co............. 1,081.84
July 22 S. O. Co................. 2,700.
“ 27 “ .................10,000.
Aug. 7 “ ................. 9,300.
Aug. 24 “ ................. 6,955.73
Sept. 5 “ ................. 1,252.65
Oct. 5 “ ................. 6,548.68
Oct. 20 “ ................. 4,449.49
Oct. 25 “ ................. 3,528.03
Total amount delivered..........51,916.42
This was all the plaintiff could ever obtain . from defendant under the contract, despite constant demands by letter and by personal interviews. Finally, defendant notified plaintiff that the contract was at an end, and plaintiff brought this suit in damages for breach of contract ' The said notice to plaintiff was conveyed by the following letter:
“Jennings, La. Nov. 9, 1905.
“Mr. J. Edw. Crusel, Jennings, La.
“Dear Sir: — This is to notify you that I have fulfilled my part of the stipulations in the contract wherein I agree to sell you two hundred fifty thousand (250,000) barrels of fuel oil at eighteen (18$) cents per barrel, f. o. b., Jennings, La., and therefore consider the contract void and refuse to deliver you any more oil on the said contract for the following reasons:
“(1) Well on which the contract was originally based (No. 4) turned out to be salt water well, and two other wells (Nos. 5 & 6) were drilled according to my agreement therein.
“(2) The contract applied to a gushing proposition only, whereas neither of the last two wells drilled were gushers and we had to resort to the use of air to get the oil out of the ground, thereby loosing 25% for air royalty.
“(3) My part of the production of both these wells does not nearly make up the fifteen hundred (1,500) barrels, mentioned in the contract to be the daily delivery. The date of this contract was something like the middle of February, and a delivery of fifteen hundred (1,500) barrels daily would have filled the contract somewhere near the middle of August or the first of September, whereas only forty thousand barrels (40,000) had been delivered up to that-date. This shows conclusively that the time limit for the fulfillment of the conditions of this contract has expired, and through no fault of mine.
“Hoping you will see my points as above enumerated, in the way they are presented to me, I remain,” etc.
This letter substantially embodies the defendant’s defense, which is that what was *295 called for by the contract was not to deliver 250,000 barrels of oil, but to drill and complete two more wells and to deliver to plaintiff the output of all the wells at the rate of 1,500 barrels per day for so many consecutive days as 1,500 will go into 250,000.
This last part of the defense has no foundation whatever in the contract, and we imagine has been persisted in by the learned counsel for defendant more to humor their client than because of any faith in it. We concur, however, with the view that the contract does not evidence an unconditional obligation to deliver 250,000 barrels of oil, but to drill two more wells, and to deliver the oil on hand and the output of all the wells at a rate not exceeding 1,500 barrels per day until 250,000 barrels shall have been delivered. The contract, when read in connection with plaintiff's letters and conduct, clearly shows that such -was the understanding. Plaintiff never pretended to demand of defendant anything more than the output of the wells, and the difference between the 135,000 barrels mentioned in the contract as being in storage and the 90,000 said to have been already contracted for. Thus under the date of July 22, 1905, he wrote to defendant:
“I do not want any more oil than that you are producing, or than your share; but I certainly expect you to turn over to me your full share of oil while I am in readiness to receive it.”
But defendant did not give to plaintiff the difference between the 135,000 barrels on hand and 90,000 already contracted for, and did not give ijlaintiff the total output of the wells, but disposed of part to others. Defendant ceased operating the wells on January 8, 1906, because they were no longer producing in paying quantities. We again agree- with him that the contract did not contemplate that he should go on operating his wells at a loss simply to furnish oil to plaintiff. We do not mean at a loss on the contract price of 18 cents, but on ruling market price, which was 26 cents when the operation of the wells, or, rather, of the last one of them, was discontinued.
We find in the record a statement showing that from March 8, 1905, to December 1, 1905, the output of defendant’s wells was 234,971.52 barrels. Why the statement was not so extended as to embrace the output to January 8, 1906, when, it would seem, operations ceased, is not explained. We think that plaintiff is entitled to a settlement on the above basis of 234,971.52 barrels, plus the difference between the 135,000 barrels said to have been on hand at the date of the contract and the 90,000 said to have been already contracted for out of the oil on hand.
Defendant’s excuse for not having delivered the oil represented in the contract as having been then in storage is that about 30,000 barrels of it were lost by leakage and evaporation. The truth of the matter is that defendant did not have the 135,000 barrels on hand, but only about 70,000, and that his contract was not for 90,000 barrels, but for the contents of his tank at so much per barrel, without specification of quantity. So that, as a matter of fact, he did not have a single barrel on hand not already contracted for. But, in our view, that makes absolutely no difference, since the quantity specified in the contract was a representation on the faith of which the contract was made. That the representation was not true makes no difference. 9 Oye. 627. The language of the representation is, “about 135,000.” We think that for the margin expressed by the “about” a deduction of 5,000 barrels would be liberal.
From the 234,971.52 barrels total output must be deducted 88,928.32, royalty to the lessor of the oil field, which royalty plaintiff cannot but have understood was not to go to him, and to which, in fact, he makes no claim. There must be deducted also 8,273.84, sold to Morse Oil Company, which was non-marketable stuff which plaintiff would not *297 have received if it had been tendered to him. This leaves 137,769.36 barrels, which, added to the 40,000, represented as having been on hand at the making of the contract, makes a total of 177,769.36 barrels, which defendant should have delivered to plaintiff under the contract, and did not.
Plaintiff had a contract with the Higgins Oil Company to deliver to said. company 100,000 barrels of oil at 23 cents within 60 to 90 days, say by the end of June. By that time defendant had delivered to him only 7,181.84 barrels, so that for fulfilling his contract plaintiff had to borrow 92,818.16 barrels. The record does not show when plaintiff returned this oil; but it was late enough for plaintiff to have returned it with oil coming from defendant had defendant complied with his contract — that is to say, had defendant delivered the 40,000 barrels represented by the contract as being then on hand — and delivered his share of the output of the wells. We say his share, because 37% per cent, had to go to the lessor of the oil field by way of royalty. In July, August, September, and October, defendant delivered to plaintiff, as appears by the statement herein transcribed, 44,734.58 barrels. Nothing shows that plaintiff could not have used this oil for returning the borrowed oil, and we think it was his duty to do so. Hence, this 44.734.58 barrels must be deducted from the 92,81S.16 barrels of borrowed oil, leaving-48.083.58 barrels, which plaintiff had to buy. The oil cost him 26 cents, 8 cents more than the contract price of 18 cents. We think he is entitled to recover this difference from defendant, say 48,083.58 barrels of oil at 8 cents, or $3,846.68.
At the time of the loan plaintiff could have bought the oil at a much lower rate, but in borrowing the oil, instead of buying it, he acted for the best interest of all parties concerned, and he did what is frequently done in the oil field, as the evidence shows; and we do not think he should be made to suffer for what was defendant’s fault.
At the time defendant put an end to the contract oil was selling at 26 cents per barrel, and for the balance, 77,769.36 barrels, which, as hereinabove stated, defendant should have delivered under the contract, we think plaintiff is entitled to recover at that price; that is to say, the difference between that price and the contract price of 18 cents, or, say, 77,769.36 barrels at 8 cents, making $6,221.54.
We do not think defendant is entitled to deduct from the output of the wells the 25 per cent, which he agreed to give to the furnisher of air pressure wherewith to bring up the oil. This was part of the operating expenses for which defendant might have paid in money. It was not shown that at the time the contract was entered into the parties contemplated that air pressure should be used and should be paid for by a deduction from the output.
From the above amount allowed plaintiff, there must be deducted 1 cent per barrel for every barrel not delivered by defendant, as plaintiff had agreed to pay that amount to the broker who negotiated the contract, and would have had to pay it if the oil had been delivered. 177,769.36 should have been delivered ; 51,916.42 were delivered, leaving 125,852.94 undelivered, which, at 1 cent per barrel, makes $125.85, to be deducted. Plaintiff is therefore entitled to judgment for $9,942.37.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be increased to $9,942.37, and that, as thus amended, it be affirmed, with costs in both courts.